**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ALEXANDER S. LANGER,<br><br>  Plaintiff,<br><br>  v.<br><br>THIRD PARTY LOGISTICS, LLC<br><br>  Defendant. | No. 3:13-CV-382 (MPS) |

## MEMORANDUM OF DECISION

  Plaintiff Alexander S. Langer ("Mr. Langer"), proceeding *pro se*, brought this action against Defendant Third Party Logistics, LLC ("TPL"), alleging one count of age discrimination under the Age Discrimination in Employment Act ("ADEA") after TPL did not offer him a position as a delivery driver. TPL now seeks summary judgment [Doc. # 44] on the grounds that 1) the position for which Mr. Langer applied was an independent contractor position, not an employee position, and thus the ADEA protections do not apply; and 2) even if Mr. Langer was applying to be TPL's employee, TPL had a legitimate, non-discriminatory reason for not hiring him, and Mr. Langer had failed to show that the reason was pretextual. Because the Court agrees with TPL's first argument, the Court GRANTS TPL's motion for summary judgment.

**I. BACKGROUND**

  Viewed in the light most favorable to Mr. Langer, the record discloses the following material facts, which are undisputed unless otherwise noted. Mr. Langer is a Connecticut resident who sought a position as a delivery driver with TPL when he was 67 years old. (Compl. [Dkt. # 1] ¶¶ 8-9, 27.) TPL, a New York limited liability corporation (Answer [Dkt. # 22] ¶ 10), provides "transportation management services to its customers, who are mainly pharmaceutical wholesale suppliers." (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 6; Pl.'s Opp. Br. [Dkt. # 46] at 4.) One

such customer is Partners Pharmacy, whose warehouse is located at 6 Thompson Road, East Windsor, Connecticut. (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶¶ 22-23.) The parties agree that in July 2012, TPL placed advertisements seeking delivery drivers, and Mr. Langer responded to one such advertisement. (Joint Rule 26(f) Report [Dkt. # 27] at 3.) John Vocke ("Mr. Vocke") was employed by TPL as a Site Manager at the Partners Pharmacy warehouse from February 2012 through late July 2012. (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶¶ 28-29.) Mr. Vocke fielded calls from individuals responding to advertisements for delivery driver positions. (*Id.* ¶ 30.) Based on the callers' demeanor and their responses about their location and availability, Mr. Vocke invited small groups of individuals—usually two to four at a time—to attend informational meetings at the Partners Pharmacy warehouse. (*Id.* ¶ 31.) Mr. Vocke met with Mr. Langer and others at one such informational meeting in July 2012. Mr. Vocke never called Mr. Langer to follow up with him after the meeting. (Answer [Dkt. # 22] ¶¶ 17, 20; Compl. [Dkt. # 1] ¶¶ 17-20.) Mr. Langer then called Mr. Vocke to inquire about the driving position, and Mr. Vocke told Mr. Langer—whose voice he did not recognize—that several routes were available, and that Mr. Langer should come to 6 Thompson Road in East Windsor on the next Monday at 10:00 am. Mr. Langer went to that location at the appointed time. He alleges that when Mr. Vocke saw him and recognized him, Mr. Vocke said "Oh, no we stopped hiring last week. We are OK." (Compl. [Dkt. # 1] ¶¶ 20-21.) Mr. Langer alleges that TPL thereafter "hired sixteen (16) applicants" who were all younger than Mr. Langer (*Id.* ¶¶ 23-25), and that TPL discriminated against him in violation of the ADEA. (*Id.* ¶ 34.)

In August 2012, Mr. Langer filed a charge with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Opportunity Commission ("EEOC") arising out of these events. (Pl.'s Opp. Br. [Dkt. # 46] at 2.) The CHRO and the

EEOC each issued a notice giving Mr. Langer the right to sue TPL in March 2013, and Mr. Langer filed his complaint against TPL on March 18, 2013. (*Id.*) Additional pertinent facts are set forth below in the discussion of the parties' arguments.

## II.     STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks and citation omitted). "Although all inferences must be drawn in favor of the nonmoving party, mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Associates v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

## III.    DISCUSSION

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA protects individuals "who are at least 40 years of age." 29 U.S.C.A. § 631(a). Mr. Langer's complaint describes TPL as "an employer within the meaning of 29 U.S.C. § 630(b)," engaged "in an industry affecting commerce" that "employs in excess of twenty

employees." (Compl. [Dkt. # 1] ¶¶ 13-15.) If true, these statements would make TPL subject to the ADEA. TPL denies that it is an employer of delivery drivers. (Answer [Dkt. # 22] ¶¶ 13-15.) TPL argues that Mr. "Langer's discrimination claim must fail as a matter of law because he never applied to be an 'employee' of TPL, as that term is defined under the ADEA." (Def.'s Mem. Mot. Summ. J. [Dkt. # 44-1] at 3.) Instead, the delivery driver position, for which he applied, was that of an independent contractor. (*Id.*) "The ADEA provides no coverage for independent contractors." *Frankel v. Bally, Inc.*, 987 F.2d 86, 89 (2d Cir. 1993).

Because the ADEA defines "employee" imprecisely as "an individual employed by any employer," 29 U.S.C. § 630(f), the Second Circuit applies a multi-factor test based on the common-law agency doctrine to determine whether an individual is an employee or an independent contractor. *See O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir. 1997). These so-called "*Reid* factors," from *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), include:

> [1] the hiring party's right to control the manner and means by which the product is accomplished ... [;][2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; and [13] the tax treatment of the hired party.

*Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 (2d Cir. 2000) (quoting *Reid*, 490 U.S. at 751-2). "Though no single factor is dispositive, the 'greatest emphasis' should be placed on the first factor—that is, on the extent to which the hiring party controls the 'manner and means' by which the worker completes his or her assigned tasks." *Eisenberg*, 237 F.3d at 114 (internal quotation marks and citations omitted). Courts "must disregard those factors that, in

4

light of the facts of a particular case, are (1) irrelevant or (2) of 'indeterminate' weight—that is, those factors that are essentially in equipoise and thus do not meaningfully cut in favor of either" conclusion. *Id.*

The Court begins its discussion of the evidence in the record in reverse order—considering Mr. Langer's factual presentation first. The Court does so because Mr. Langer has introduced almost no evidence related to the independent contractor issue. This failure cannot be attributed to any lack of notice as to the importance of the issue or even to Mr. Langer's *pro se* status. TPL alleged the independent contractor point repeatedly in its answer, and Mr. Langer had an opportunity to conduct discovery on the issue, but declined to do so. (Def.'s Mem. Mot. Summ. J. [Dkt. # 44-1] at 5; Pl.'s Opp. Br. [Dkt. # 46] at 2.) Mr. Langer's complaint stated that "on or about July 1, 2012, the plaintiff applied for a job." (Compl. [Dkt. # 1] ¶ 16.) TPL denied this statement in its answer, and "by way of further answer state[d] that Plaintiff responded to an ad seeking independent contractor delivery drivers." (Answer [Dkt. # 22] ¶ 16.) Similarly, Mr. Langer's first cause of action stated that "[o]n or about July 13, 2012 defendant refused to hire the plaintiff." (Compl. [Dkt. # 1] ¶ 28.) In its answer, TPL "admit[ed] that it declined to contract with the Plaintiff as an independent contractor driver in or around July 2012, but denie[d] any and all remaining allegations or inferences in Paragraph 28" of the complaint. (Answer [Dkt. # 22] ¶ 28.) TPL also pled, as an affirmative defense, that "[t]he ADEA does not apply to the Plaintiff because no employment relationship with the Plaintiff was at any time contemplated by TPL." (Answer [Dkt. # 22] at 5.) Mr. Langer has thus been on notice that the independent contractor issue was central since almost the outset of the litigation.

Mr. Langer has also been on notice of the opportunity to take discovery from TPL since early in the case. On June 10, 2013, the parties filed a case management plan in which they

stated that they corresponded by e-mail and held one telephone conference on May 29, 2013. (Joint Rule 26(f) Report [Dkt. # 27] at 1.) As part of this case management plan, the parties agreed to "exchange initial disclosures required by FRCP 26(a) by September 1, 2013." (*Id.* at 4.) They anticipated a need for discovery on issues arising out of Mr. Langer's complaint and TPL's defenses, as well as Mr. Langer's damages and his efforts to mitigate those damages. (*Id.*) The parties set a deadline of February 1, 2014, for completing discovery. (*Id.*) Mr. Langer thus had ample notice of the opportunity to take discovery. The Court approved the parties' case management plan, but set the deadline for dispositive motions approximately two months earlier than the parties had agreed. (Scheduling Order [Dkt. # 28].)

On the same day that it filed its motion for summary judgment, March 3, 2014, TPL filed the requisite notice to *pro se* litigants pursuant to Local Rule 56(b), as well as copies of the full text of Fed. R. Civ. P. 56 and Local Rule 56.[1] The purpose of this notice is to notify the *pro se* plaintiff that the defendant has filed a motion for summary judgment, and to explain that the defendant's motion may be granted—and the plaintiff's claims dismissed—if the plaintiff fails to file opposition papers before the deadline for doing so. (Notice to *Pro Se* Litigant [Dkt. # 45] at 1.) The notice specifies that, in order for the plaintiff to prevail, its opposition papers must set forth evidence that contradicts defendant's evidence, and that the plaintiff "must file one or more affidavits disputing the [d]efendant's version of the facts." The plaintiff "may also file deposition transcripts, responses to discovery requests and other relevant evidence" in support of his claims. (*Id*. at 2.) The notice further warns that:

---

[1] CT R USDCT L.Civ.R. 56(b) provides, in relevant part:
> Any represented party moving for summary judgment against a party proceeding pro se shall file and serve, as a separate document, in the form set forth below, a 'Notice to Pro Se Litigant Opposing Motion for Summary Judgment.' . . . The movant shall attach to the notice copies of the full text of Rule 56 of the Federal Rules of Civil Procedure and of this Local Civil Rule 56.

6

> the Local Rule requires counsel and pro se parties to cite to specific paragraphs when citing affidavits or responses to discovery requests and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length. If you fail to comply and submit evidence contradicting the [d]efendant's version of the facts, your claims may be dismissed if the [d]efendant's motion shows that the [d]efendant is entitled to judgment as a matter of law.

(*Id*.) Thus, Mr. Langer was on notice that he needed to submit evidence to oppose TPL's motion for summary judgment, and that he needed to contest the facts put forth by TPL showing that the driver position was an independent contractor position.

Despite receiving ample notice of his opportunity to do so, Mr. Langer did not seek discovery from TPL. (Def.'s Mem. Mot. Summ. J. [Dkt. # 44-1] at 5; Pl.'s Opp. Br. [Dkt. # 46] at 2.) Mr. Langer provided two affidavits. Nothing in Rozsa Virag's affidavit addresses the independent contractor issue (Pl.'s Ex. A, Virag Aff. [Dkt. # 46]), and Mr. Langer's own affidavit states only that "there was no mentioning of any 'independent contractor' position" at the group informational meeting. (Pl's Ex. B, Langer Aff. [Dkt. # 46] ¶11.)

Mr. Langer has put forth no admissible evidence to rebut TPL's showing that the driver position was an independent contractor position. The fact that Mr. Vocke did not clearly explain that the delivery driver position had the status of independent contractor, rather than employee, is irrelevant. Moreover, Mr. Langer acknowledged that Mr. Vocke stated at the initial informational meeting that drivers must supply their own vehicles and pay for their own insurance. (Langer Aff. ¶¶ 6-7.) Mr. Langer also confirmed that "[Mr.] Vocke stated that anyone can be sub-contracted with the driver's shipment." (Langer Aff. ¶ 11.) As discussed below, these factors point toward independent contractor status.

**A. Control Over the Manner and Means of Work, Including i) Discretion Over When and How Long to Work; ii) Source of Instrumentalities and Tools; and iii) Whether Hiring Party has Right to Assign Additional Projects to Hired Party**

TPL argues that its role is simply to find, and contract with, independent drivers and couriers to make deliveries for its customers, including Partners Pharmacy. (Def.'s Mem. Mot. Summ. J. [Dkt. # 44-1] at 5.) TPL has submitted a sample contract that its drivers sign as evidence that the parties expressly agree that the driver, called an "Owner/Operator," is an independent contractor (Williams Aff. Ex. 1 "Independent Contractor Owner/Operator Agreement" [Dkt. # 44-6] ¶ 8(a).) TPL argues that the sample agreement shows that TPL has little control over the manner and means of work. (Def.'s Mem. Mot. Summ. J. [Dkt. # 44-1] at 5.) Such "contractual language fixing the relationship between [the plaintiff and the defendant], although not dispositive, provides strong evidence of the parties' intentions." *DeSouza v. EGL Eagle Global Logistics LP*, 596 F. Supp. 2d 456, 464 (D. Conn. 2009) (internal quotation marks and citation omitted). Even if TPL's sample agreement is not identical to the one that Mr. Langer would have signed had TPL sought to engage him, the sample agreement, along with the statements in the affidavit of TPL's President and founder, Michael Williams, "set[] forth an independent contractor relationship." *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 347 (S.D.N.Y. 2009) (accepting a magistrate judge's recommended ruling granting summary judgment under the ADEA and Title VII in favor of 7-Eleven because franchisee applicant would have been an independent contractor under 7-Eleven's standard agreement, and could not be considered a potential employee of 7-Eleven).

        **i)**     **Discretion Over When and How Long to Work**

TPL "drivers contract to perform deliveries on a particular route and have a designated time frame within which to make their deliveries, but within that shift, they set their own

schedule of deliveries and follow their own driving directions and routes." (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 13; *see also* Williams Aff. [Dkt. #44-5] ¶ 14.) The "imposition [of] timetables and schedules does not strip an independent contractor of his status." *DeSouza*, 596 F. Supp. 2d at 465. Drivers are permitted to contract with other companies besides TPL, and they are permitted to deliver for other customers besides Partners Pharmacy. (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 21; *see also* Williams Aff. [Dkt. #44-5] ¶ 20.) Because these circumstances show that TPL had limited control over the drivers' work and conditions of employment, this factor weighs in favor of independent contractor status.

> ii)     Source of Instrumentalities and Tools

The sample contract provides that drivers must obtain their own vehicles and their own insurance, and pay their own expenses (e.g. fuel, tolls, maps, and cell phone). (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 9; Williams Aff. [Dkt. # 44-5] ¶ 13; Williams Aff. Ex. 1 "Independent Contractor Owner/Operator Agreement" [Dkt. # 44-6] ¶ 2.) Drivers must also provide their own clothing, and are told not to place logos for TPL or Partners Pharmacy on their vehicles or clothing. Some customers, however, require that drivers wear IDs or purchase or rent certain equipment (e.g. scanning devices). (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 12; Williams Aff. [Dkt. # 44-5] ¶ 13.) Mr. Langer acknowledged that Mr. Vocke told him at the informational meeting that drivers would have to supply their own vehicles and pay for their own insurance. (Langer Aff. ¶¶ 6-7.) Because drivers were responsible for providing their own vehicles, clothing, and equipment for work, this factor weighs in favor of independent contractor status. *DeSouza*, 596 F. Supp. 2d at 465.

### iii) Whether Hiring Party has Right to Assign Additional Projects to Hired Party

"An employer generally directs an employee as to which tasks to perform, while an independent contractor is obligated only to perform whatever tasks it has agreed to by contract." *Johnson v. FedEx Home Delivery*, No. 04-CV-4935 JG VVP, 2011 WL 6153425, at *13 (E.D.N.Y. Dec. 12, 2011). There is no evidence that TPL had the right to assign delivery drivers additional projects beyond their scheduled routes, which they chose whether or not to accept from TPL. (Williams Aff. Ex. 1 "Independent Contractor Owner/Operator Agreement" [Dkt. # 44-6] ¶ 2.) Drivers could themselves choose "to drive more than one route or multiple shifts per day." (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 14; Williams Aff. [Dkt. # 44-5] ¶15.) But, like the plaintiffs in *Johnson,* TPL could not assign delivery drivers "to perform other tasks" besides delivery services, "such as sorting packages or clerical duties." *Johnson*, 2011 WL 6153425, at *13. Thus, this factor weighs in favor of independent contractor status.

Thus, TPL had little control over its delivery drivers, and the first factor—together with three related factors—weighs in favor of independent contractor status. *See DeSouza,* 596 F. Supp. 2d at 465 (finding that the "manner and means" factor weighed in favor of independent contractor status where delivery drivers could determine their own routes, schedule their own breaks, and realize a profit from their driving).

### B. Skill Required

According to TPL, delivery drivers are required to have "the ability to handle urgent situations and a comfort level handling controlled substances, a generally approachable demeanor to interact with the care givers and nursing home staff accepting the deliveries, and preferably some experience as a delivery driver or courier." (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 33.) It is not clear which kinds of urgent situations the delivery drivers might face. TPL

also stated that it "does not provide formal training or orientation to the drivers. Upon contracting with the drivers, TPL expects them to have the skill and experience to perform the tasks they contract to do independent of any training from TPL." (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 17.) Mr. Langer states that Mr. Vocke made a copy of his Connecticut driver's license and told him that "interested drivers would have to undergo a background and driving record check." (Compl. [Dkt. # 1] ¶ 17.) Although having a driver's license with a clean driving record is not a particularly specialized skill, having the ability to handle urgent situations may require the exercise of independent judgment. The Owner/Operator Agreement states that delivery drivers "shall use [their] own independent judgment and discretion for the most effective and safe manner in conducting pick-up and delivery services." (Williams Aff. Ex. 1 "Independent Contractor Owner/Operator Agreement" [Dkt. # 44-6] ¶ 1.) It is unclear, however, why independent judgment and discretion are necessary to pick up and drop off items for delivery, and TPL provides no specific examples of the need for delivery drivers to exercise independent judgment and discretion. Therefore, viewing the evidence in the light most favorable to Mr. Langer, this factor weighs in favor of employee status. *Compare DeSouza,* 596 F. Supp. 2d at 465 (finding that although the skill required for a delivery driver position that required a *commercial driver's license* was not "unusually high, it nevertheless requires training and calls for the exercise of independent judgment," and as such, favors independent contractor status), *with Johnson*, 2011 WL 6153425, at *11 ("An independent contractor is more likely to be highly-skilled than unskilled. . . . Presumably, the only skills truly 'required' for the work the [plaintiffs] did are the ability to drive a van and carry packages.").

### C. Location of Work

At the beginning of their shifts, the drivers are expected to pick up the items to be delivered from the Partners Pharmacy warehouse at 6 Thompson Road, East Windsor, Connecticut, and at the end of their shifts, they are required to drop off their delivery manifests. The rest of the drivers' work involves driving and delivery services away from the physical locations of Partners Pharmacy (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 19.) Moreover, "TPL does not have an office in Connecticut." (*Id.* ¶ 23.) Because the drivers perform their work off of TPL's premises, this factor would seem to weigh in favor of independent contractor status. However, it is the nature of delivery work to be off-site. Therefore, this factor is neutral. *Johnson*, 2011 WL 6153425, at *10 (disregarding this factor as irrelevant because "[t]he very nature of delivery work requires deliverers to travel from a centralized pick-up location to an array of remote drop-off locations. It is the nature of the work rather than the status of the workers as employees or independent contractors that dictates where this work will take place.").

### D. Duration of Relationship Between the Parties

Drivers' agreements with TPL are for an initial term of thirty-days, and are then terminable at will by either party, with notice. In practice, some delivery drivers worked with TPL for several months, and others worked with TPL for several years. (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 8.) The fact that the working relationship continues indefinitely until one party terminates it suggests that this factor weighs in favor of employee status. *See Johnson,* 2011 WL 6153425, at *11 (finding that a delivery driver operating agreement "for a fixed two-year term" that "would renew automatically for successive one-year terms absent notice of non-renewal" suggests that the parties "intended to enter into 'a permanent working arrangement.'").

### E. Method of Payment, Tax Treatment, and Provision of Employee Benefits

Delivery drivers negotiate their compensation with TPL, and are either paid by the number of delivery stops or by their mileage. (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 11.) Thus, this factor weighs in favor of independent contractor status. *DeSouza,* 596 F. Supp. 2d at 466 (finding that this factor weighed in favor of independent contractor status where plaintiff was paid on an "on the job" basis and "was not paid a salary nor . . . by the hour.").

Delivery drivers must pay their own taxes using IRS Form 1099s. "TPL does not withhold federal or state taxes from" drivers' paychecks. (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 11.) TPL also does not provide delivery drivers with any benefits typical of employees, such as "health or dental insurance, vacation time, or participation in a pension plan." (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 9.) Thus, these two factors also weigh in favor of independent contractor status. *See DeSouza,* 596 F. Supp. 2d at 466-67 (finding that because the plaintiff was not entitled to employee benefits and the defendant issued him an IRS 1099, making the plaintiff responsible for paying his own taxes, both factors weighed in favor of independent contractor status).

### F. Hired Party's Role in Hiring and Paying Assistants

Drivers for TPL could choose to subcontract with employees of their own (a point Mr. Langer admits he learned at the informational meeting). Drivers are responsible for hiring, paying, and supervising their own subcontractors. (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶ 10.) The Independent Contractor Owner/Operator Agreement states, in relevant part:

> Owner/Operator may designate a substitute, a subcontractor or hire its own employee to execute a delivery or pick-up provided that said person (i) meets the same standards, criteria and qualifications as Owner/Operator which are provided in this Contract and (ii) is covered by either Occupational Accident Insurance or Workers' Compensation Policy (as applicable) paid for and provided by Owner/Operator.

(Williams Aff. Ex. 1 "Independent Contractor Owner/Operator Agreement" [Dkt. # 44-6] ¶ 2(e).) Thus, this factor weighs in favor of independent contractor status. *See DeSouza,* 596 F. Supp. 2d at 466 (finding that this factor weighed in favor of independent contractor status because the driver could hire his own employees to "assist[] him in his driving assignments.").

### G. Whether Work is Part of the Regular Business of the Hiring Party and Whether the Hiring Party is in Business

TPL does not dispute that it is in business, and that delivery services are part of its regular work. (Def.'s L.R. 56(a)(1) Stmt. [Dkt. # 44-2] ¶¶ 5-6.) TPL notes, however, that it also offers its customers other services, such as creating and providing service reports and delivery logs, inspections of freight, organizing paper and delivery manifests, dispatching drivers for customers, and coordinating communications between drivers, customers and delivery recipients. Therefore, TPL argues, delivery services are not its "regular business," and this factor should weigh in favor of independent contractor status. The Court finds, however, that these other services are directly related to its delivery services. Thus, delivery drivers' services are part of TPL's regular business, and this factor weighs in favor of employee status.

\* \* \*

Because one of the thirteen factors, location, is neutral, the Court disregards it. *Eisenberg*, 237 F.3d at 114. Four of the remaining twelve factors—i) whether the work is part of the regular business of the hiring party, ii) whether the hiring party is in business, iii) the skill required, and iv) the duration of the employment relationship—weigh in favor of employment status. Eight factors weigh in favor of independent contractor status, including the first factor, which receives the greatest emphasis. *Id.* Thus, the delivery position with TPL is an independent contractor, not

14

an employee. Mr. Langer is not entitled to relief under the ADEA, and the Court does not reach the parties' other arguments.

## IV.     CONCLUSION

For the foregoing reasons, the Court hereby grants Defendant's motion for summary judgment [Doc. # 44], and directs the Clerk of the Court to enter judgment in favor of Defendant.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:     Hartford, Connecticut
           January 22, 2015